The Judges pronounced their opinions.
JUDGE TUCKER,
after reciting; the terms of the agreement between William *123 Madison and Rowland, proceeded as follows: ■
To this contract Gabriel Madison, a third brother, was the only subscribing- witness. It was proved by him and recorded in Lexington District Court, State of Kentucky, Sept. 18, 1800, almost twenty years after its execution, and six months after this suit was brought.
On the same day that this contract was entered into, Gabriel Madison agreed to let Rowland have land in Kentucky, under the proclamation, to enable him to comply with that contract. William was privy to this agreement, and afterwards (as Gabriel thinks) made choice of 1,000 acres on 310 Simpson’s *Creek, in a letter written to Gabriel, who had 3,000 acres in Kentucky, of which William was to have choice.
On the 14th of July, 1781, William Madison conveyed to John Gordon, 1,000 acres of land on Boon’s Creek, Kentucky. This, it is said, is the land which Rowland Madison had, previously to the above mentioned contract, sold to John Gordon, without any authority from William, and received some trifling consideration for, from John Gordon. But the consideration expressed in the deed, is one hundred pounds, current money of Virginia, in hand paid by Gordon to William. No other, or further consideration is mentioned.
On the 5th and 6th of November, 1781, John Craig and wife, by deeds of lease and release conveyed to William Madison, four hundred acres of land in Montgomery County, Virginia, called Hand’s Meadow. This land is said to have been given by Craig to Madison, in exchange for the 1,000 acres on Simpson’s Creek, which Gabriel, in behalf o£ Rowland, was to furnish William with ; but the consideration expressed in the deed of release is 4001. current money of Virginia, by Craig to William in hand paid. Hugh Crockett states, that he understood from both Craig and Madison, that the Simpson’s Creek land, and 1251. specie, were to be in full of this land ; that, since William’s death, (which happened in March, 1782, and in the life-time of his father,) he has understood and believes, one Hite had established a better title to the Simpson’s Creek lands; that Craig, in his presence, applied to Gabriel, in whom the legal title, under which William claimed, was, to make him a deed, which Gabriel said he could not do, but would give him in lieu of it 1,000 acres on the Ohio; which offer Craig refused, and has since informed the witness that he had got the Hand’s-Meadow tract back, and was in possession of it; though the witness understood the legal title thereto is still in William Madison’s heirs, ■ the present complainants.
In March, 1782, William Madison died intestate, and the bill charges that Thomas Madison, William Preston, and the 311 ^defendant Andrew Lewis, took out letters of administration on his estate, and of course that they possessed themselves of and examined all his papers, among which the agreement first mentioned was, which was by no means a secret in the family. The answer denies that William’s papers were ever in the defendant’s hands; alleging that they were delivered to Thomas Madison, by William’s widow; he, Thomas, having signified the advantage of his keeping the papers, as he was a practising lawyer.
In March, 1784, or before, John Madison, the father of William, Rowland, Gabriel, and Thomas, died. By his will he devised to his wife the plantation whereon he then lived, during her life. And, as to the lands whereon he then lived, and whereon his son William lived, he devised the upper part, whereon he then lived, to his son Rowland, in fee-simple ; and the lower part, whereon William lived, to William’s widow for life, with remainder to the present complainants. The upper part, thus devised to Rowland, forms the subject of the present controversy.
The bill charges, that at the time of the agreement entered into between William and Rowland, as before stated, it was well known among the brothers, and others, that their father intended to devise that part, called Voss’s, to Rowland in fee; and that it was this identical land which Rowland bound himself to give William in recompense for the Boon’s Creek land, (which he had sold, as stated in the agreement,) in case he failed to comply with his engagement, to make William a clear and undisputed title to 1,000 acres of military lands : that John Madison, the father, was acquainted with the existence of this contract, and by no means disapproved of it; as in a will of an early date he had devised the same lands to Rowland, and, though shortly before his death, he altered his will in some other respects, he continued that devise to Rowland ; that the defendant, Andrew Lewis, had married a sister of William and Rowland, and was unusually intimate with them and their affairs, 312 *and very high in their confidence and that of the family; that he qualified as administrator of William, as before mentioned, and acted as such in a variety of instances ; whereby, and by reason of his intimacy and connection with the family, he mitst have been acquainted with the agreement before mentioned ; and, but for the grossest negligence, might have known of William’s title to the land bequeathed to Rowland by his father ; notwithstanding which, he purchased the same of Rowland ; and the bill suggests, as a motive thereto, that a great part of the purchase-money consisted in a debt or debts due to him from Rowland, who was, at that time, in circumstances which threatened he would break, and who, since the purchase, actually became insolvent, after having removed out of the State so that Lewis believed he had no other mode of securing his debt, but by that purchase ; that after the purchase, and before any conveyance was made from Rowland to Lewis, Elizabeth Madison was appointed guardian to her daughters, and gave Lewis notice she would institute a suit for Voss’s, (the land in controversy,) as she was satisfactorily advised Rowland could not make a title to 1,000 acres of military land in Kentucky ; notwithstanding which, Lewis paid up the balance of the purchase-money to Rowland ; that Rowland never did tender or survey the 1,000 acres of military lands, which might have been substituted for the Virginia lands, according to the agreement; and that the Kentucky land *124 is worth from 3,000 to 5,0001., and would be preferred by the complainants, under existing circumstances.
The answer of Lewis states the devise to Rowland, as made in pursuance of a promise made when he was about to marry ; that Rowland, who, at his father’s death, (early in 1784,) resided in Kentucky, returned and settled on Voss’s, and resided there till 1790: that being desirous of removing again to Kentucky, he proposed to sell Voss's to the defendant, who, believing the title derived from his father was a good one, free and clear from all encumbrances, purchased it at the price of 2,0001. : he admits that about 3001. of the 313 *purchase-money consisted of a debt due from Rowland to himself, but denies the motive was to secure that debt, as Rowland was then solvent for a much larger sum. He obtained possession in 1790, having made payment to the amount of about 1,8751. including the above debt; the sum of 1251. being left in his hands towards discharging a debt of Rowland’s. “And in that situation the case remained until some time in the year 1792, when, to his surprise, the complainant Elizabeth informed him of the contract mentioned in the bill.” He positively denies that he had any notice of the contract; for, although he was one of William’s administrators, and took some care of the estate until the sale, yet his papers were never in his hands, but were delivered to Thomas Madison by his widow, the complainant Elizabeth ; that although Thomas Madison drew the articles of agreement between the defendant and Rowland, and the bond for a title, yet he gave him no notice of the contract between William and Rowland, as he could have proved if the suit had not been delayed till after the death of Thomas ; and believes it was kept a secret from their father. He admits that, after the notice given him in 1792, as before stated, he did, in pursuance of an award, pay to Rowland, 1751. or thereabout, and received his title ; being, as he supposed, the most prudent course for him to pursue.
Rowland Madison’s bond to Lewis to make him a title to Voss’s, bears date December 5, 1789. He removed to Kentucky, as appears by the deposition of William Lewis, in October, 1790. Another witness, Hugh Crockett, proves, that Mrs. Elizabeth Madison, the guardian of the complainants, and widow of William, rode with Rowland and his wife 15 or 16 miles, when they set out on their journey to Kentucky; and this it is stated happened the day before the payment, either of the balance of the purchase-money, or of the principal part of it, (for it is not quite clear which is meant, though I rather think the balance,) by Lewis to Rowland. Lewis’s answer fixes the period when he first 314 *received notice from Mrs. Madison, to the year 1792. Another witness, James Barnett, states that he was present at what he conceived to be a final settlement between Lewis and Rowland, the day before the latter set out for Kentucky. Hugh Crockett, as attorney in fact for Rowland, executed a conveyance to Lewis for the lands, after Rowland had removed to Kentucky. This witness, in answer to a question whether he did not know that Lewis had notice of the complainant’s claim to Voss’s, before he made the deed under the power of attorney from Rowland, answers, “I do not know whether it was before, or after, but think it was about that time, that Lewis and Mrs. Elizabeth Madison had some conversation in this deponent’s^ presence, respecting the complainant’s claim, and this deponent recollects that he was apprehensive of some danger from acknowledging the deed, and took advice upon the subject; but the cause of his apprehension he does not at present recollect.” There is no evidence whatsoever to contradict that part of Lewis’s answer wherein he denies notice until 1792. Nor is there any reason to infer from the publicity, or notoriety of the transaction between the brothers, that he had notice. And, although it appears to have been known not only to Gabriel Madison, but to his brothers Thomas and George, yet no communication or hint of it appears to have been given by them, or any other person, to Lewis. Rowland, when he removed to Kentucky, carried a considerable property with him, in negroes, wagons, horses, and other things: and, though he seems to have been considered as an extravagant man, his circumstances at that time appear to have been unembarrassed, and his credit good.
I cannot agree with the counsel for the appellant that the contract between William and Rowland, for an eventual satisfaction for an unauthorized sale by the latter, of the Boon’s Creek tract of land, which belonged to the former, was, under the circumstances of this case, contra (bonos mores. If, as stated in the answer, and perhaps in some other parts of the record, their father in contemplation of Row-315 land’s ^marriage, had made him a promise to give him a particular tract of land, I can see nothing immoral in a promise, to his brother, eventually to make him satisfaction for the wrong he had done him, out of that land, when he should come into possession of it; if he did not before make him a compensation in the manner stipulated by their agreement. And, if such a promise had been proved, and the land which was the subject of it, clearly identified, I do not know how a Court of Equity could have refused to decree a specific performance of that agreement between the parties themselves, or their legal representatives, (a) But I am not satisfied, from any thing in this record, that the father made any such promise ; or, if he did, whether it ought to be understood as relating to the upper or the lower part of the tract called Voss’s. Nor, perhaps, would this be a matter of any importance, if this suit had been brought against Rowland in his life-time for a specific performance of this agreement between himself and his brother. But that not being the case, the question, between the present parties, must, I conceive, turn upon points altogether different; since the question of notice seems to be naturally connected with that of certainty. The written contract between Rowland and William Madison, is entirely defective in this particular. According to the grammatical sense of it, it would appear to relate to some lands in Virginia, which *125 had been before that time devised to Rowland, by some person or other, and to which his title was indisputable, though, from some cause or other, he had not yet obtained the possession. But who the testator was, and where the lands might lie, within the County of Botetourt, in the State of Virginia, can no more be discovered from this contract than the way of an eagle in the air. Neither is it more certain, if considered as a contract concerning lands in expectancy, and to be given him by some person not yet deceased. And, however the maxim “id cerium est quod certum reddi potest” may apply to such a contract, as between the parties, or 316 privies thereto, it has, I ^conceive, no application to a stranger, who may become a fair purchaser for a valuable consideration. For such a construction would tend to lock up all the property in lands within the State, and render them perfectly unalienable. In contracts of this nature we are told by the author of the celebrated treatise on equity,(a) that the Court does not bind the interest, but, instead of damages at law, enforces the performance in specie : that is, as I understand the book, as between the parties to the contract; for, without binding the interest, I cannot discover how a pure!, aser of it could be affected, (b) The rule in equity is, that, where a man is a purchaser without notice, he shall not be annoyed in equity, not only where he has a prior legal estate, but where he has a better title or right to call for the legal estate than the other, (c) To apply this; A. being indebted to B. covenants with him to convey to him a certain non descript tract of land, which he either hath, or expects to have, by the benevolence of some friend. A. afterwards becomes possessed of certain lands by devise from his father, enters therein, and resides thereupon several years: C., without notice of this covenant between A. and B. purchases these very lands ; pays the whole or nearly the whole of the purchase-money to B.; obtains possession ; enjoys and improves the lands for two years ; and then pays up the balance, and obtains a conveyance, but, previous to such last payment, receives notice. Which of these persons, in the eye of equity, and reason, had the better right to call for the legal estate, at the time when C. obtained his conveyance 7 Surely he whose contract was most clear and certain, as having these very lands and no other, in contemplation ; whereas the other might be satisfied by a hundred different tracts, provided they lay in a County containing several millions of acres. Nor can I by any means agree, that the payment of the balance of the purchase money, (after notice of this uncertain contract,) and taking a conveyance, shall, by mere relationship, be taken as strongly against him, as if he had had the 317 fullest and most *complete notice, before he had entered on the lands, or paid a shilling of the purchase-money. For the principle upon which a Court of Equity proceeds in setting aside contracts by subsequent purchasers, on the ground of notice, appears to be, that the first contract creates a specific lien upon the lands. But that cannot be, where the contract is so uncertain, as that, if it were immediately published in a gazette, no stranger could be thereby admonished further, than not to deal at all with such a person for any lands, either that he hath, or thereafter may have, as long as he lives. But such a warning as this must be void : as against all the principles of social life and intercourse. I agree, therefore, to what was said in the case of Walcott v. Swann, (MS.) that those decisions which apply, on this point, with respect to a definite ascertained portion of property, will not extend to a vague and indefinite contract of this kind; it being a leading principle that, to affect a subsequent purchaser pn the ground of implied notice of a former title, there must be something to lead such purchaser distinctly to a knowledge of such title, with reference to the identical specific property in question.
It is material in this case to observe, that the first notice which Lewis received of this contract was after Rowland Madison had removed to Kentucky, and had put Lewis, into actual possession of the lands, having before that time received the whole of the-purchase-money, except a small balance, and that undertaken to be paid to a third person. And all this happened under the eyes of the-widow of William, and with the actual privity and agency of Thomas Madison, his. administrator. So far as the personal estate of William might possibly be benefited by the specific performance of the contract between William and Rowland, these circumstances would operate to rebut every ground of equity which either the widow or-tho administrator might pretend to.
There is still another important point in this case. Even supposing the contract sufficiently certain to designate Voss’s 318 *as the subject of the eventual agreement between William and Rowland, still, in respect to that tract of land, there was a mere contingent liability, in case something, which was convenanted to be previously done, should not be done. So. that here was a contingency upon a contingency. Such contingencies, even in wills, are not often favoured. But where they-occur in a deed, and, much more, where they relate to lands, which the covenantor neither-possesses at the time, nor even has a scintilla of right to, either in law or equity, I believe no case can be produced, and certainly none has been cited, to shew that they have ever been carried into effect. But,, were it possible that such a double contingency, as this is, could be considered as proper to be carried into specific execution, it is further observable, that steps had been taken from its very commencement, by Rowland, to procure the military lands; that William made choice of one tract of 1,000 acres ; that upon its being discovered that a good title could not be made to that, Gabriel was ready to have given another tract of 1,000 acres on the Ohio; that no laches are imputable to Lewis, who was no party to that contract, in not procuring a conveyance ; and that Rowland never parted, with his 1,000 acres, until after Lewis had paid him up fully, and had got a conveyance,. *126 for Rowland, as appears by Gabriel Madison’s deposition, never sold this land until after the year 1795. And, possibly, nay, probably, had the suit against Gabriel, which Walter Bell brought for a conveyance of the Ohio land, been defended properly, no- decree would have been made in Bell’s favour to the prejudice of the present complainants. So that the contingency by which Voss’s could have been made liable, did not actually happen until several years after the land was purchased, entered upon, paid for, and a conveyance executed. Under such circumstances, I cannot regard Eewis in any other light than as a fair purchaser, without notice of any actual charge or encumbrance on the lands purchased, either at law or equity, and therefore think the decree erroneous upon that ground. I have not considered the question as to the want of parties, but, as at present 319 advised, ^(though I mean not to give any opinion upon it), the representatives of Rowland, and the several representatives of William seem necessary to have been before the Court, in order to do complete justice, if ¿ decree for a specific performance of the contract should have been thought proper. But, as my opinion is not so, I pass over the question, and conclude with giving my. opinion that the decree ought to be reversed, and the bill dismissed with costs.
JUDGE ROANE.
This is a bill brought by Elizabeth Madison, as mother and next friend to her infant daughters, against the appellant. The bill was exhibited in May, 1800 ; and its object is, to enforce the specific execution of an agreement of October 10, 1780. John Madison, the grand-father of the infant appellees, having died prior to March, 1784, when his will was proved, it follows that more than sixteen years had elapsed between the time when the contract came into existence, and might have been enforced, (if at all,) subject to the life-estate of the testator’s widow, (the precise time of whose death does not appear,) and that of the institution of the suit : and, if a reasonable time should also be allowed to enable the appellees to get a title to the Kentucky land, which, in the first instance, was to be conveyed by Rowland Madison, and for which the contract (as it related to the Virginia lands) appears only to have been intended as a security, still a very great space of time was suffered to elapse prior to the institution of the suit. In the mean time Thomas Madison died in 179-, who, as administrator of William Madison, was possessed of his papers, till about the year 1787, and, among them, it is presumed, of the contract now endeavoured tobe setup; and who (as is evident from the testimony actually given in this cause) could have thrown much light upon the subject. Rowland Madison was also suffered to die about the year 1798, who, possibly, in his life-time, could have defended himself more efficiently against this claim than the present appellant can ; and whose papers and representatives, if even they were before the Court, might 320 *possibly operate to the same purpose ; but his representatives are not parties to this suit! In the mean time also Rowland Madison was permitted to return from Kentucky, and reside upon the lands in , controversy 3 or 4 years, and sell the same to the appellant, for a full and fair price, without any notice whatever of the encumbrance, as appears by the testimony; to move away, full-handed as to property, accompanied on part of the journey by Mrs. Madison, the mother and next friend of the appellees, who never gave any kind of notice of the claim, although she or her brother was possessed of the papers before that time, and although she had, (as is proved by J. Smith,) between 1783 and 1788, frequently spoken of this contract, but that in a confidential manner. It was not until 1792, perhaps two years after the purchase by the appellant, that the said Mrs. Elizabeth Madison apprized him of her claim. As for Thomas Madison, the only acting administrator of William Madison, and who was possessed of his papers till 1787, (Andrew Lewis having never been possessed thereof,) he is not only not proved to have ever mentioned the contract to Andrew Eewis, but, on the contrary, his conduct on several occasions purported that he knew of no effective lien thereon, and, in particular, in his having drawn the title-bond, of December 5, 1789, from Rowland Madison to Andrew Eewis. So, also, Mr. Francis Preston, who, probably, as brother to Mrs. Madison, was possessed of the papers in question, (See Susannah Madison’s deposition,) from the year 1787, forwards, not only never mentioned this claim to the appellant, or any other, but, in the year 1790 or 1792, wrote to Gabriel Madison concerning the Simpson’s Creek lands, which had been elected in discharge of the contract; and was thereupon informed by the said Gabriel Madison that he was ready to convey them upon getting the release of Rowland Madison. All these' circumstances of assent, acquiescence and encouragement, on the part of the natural friends and guardians of the infants, and, above all, the suffering Rowland Madison so long to possess, and then sell out the land, without objection, would 321 *be undoubtedly powerful enough, of themselves, to put an end to this controversy, but for the consideration (as to which, however, I mean to pass no opinion in this case) of the very great tenderness shewn to the interests of infants in the Courts of Equity. The land, which is now sought for by the appellees, was not only not demanded within a reasonable time, but a good reason is found therefor, in that William Madison, in his life-time, had elected the Simpson’s Creek lands, and conveyed them, with a general warranty, to Craig, who was extremely importunate to get those identical lands, and those only. A conduct, therefore, marked by all the foregoing circumstances, and a delay arising from, if not accounted for, by the consideration of the conveyance of the Simpson’s Creek lands to Craig, (which also is not to be affected by the subsequent arrangement with Craig in this particular,) ought not to operate injuriously to the appellant : nothing in our code of equity could possibly have that effect, (as I have before said,) but the extreme tenderness of that code for the rights of infants ; if even that consideration should be found to turn the scale, under all the circumstances of this case.
It is not necessary, however, to decide this *127 cause upon the foregoing grounds. It is not necessary to decide whether that mother who, as natural guardian to her children, has brought this suit in the character of next friend, was also competent by her acts and conduct to bind them ; nor whether the acts of even the whole congeries of their natural and constituted friends and protectors were competent to work this effect. This cause may well go off, on ordinary grounds, and independently of all the foregoing considerations.
The question before us is, (for such is the prayer of the bill,) whether the appellees are entitled to a conveyance of the specific tract of land now in question. Putting out of this case so much of the contract of April 10, 1780, as relates to the military land, which appears to have been the principal object contemplated by the parties, and on 322 that Aground, perhaps, accounts for the vagueness of the contract taken in relation to the Virginia lands, let us examine this contract, in relation to the lands last mentioned. That contract is to convey, eventually, “his” (Rowland Madison’s) and in Botetourt ; and again to convey “his land willed to him,” when he comes to the possession of it; and that he, Rowland Madison, will make William Madison a title to “the land,” first “having both tracts valued,” &c.
While the first expression in this contract, “his” land, would seem to import that the land contemplated, was land of which Rowland Madison was then possessed, or to which he was at least entitled, the second expression only enlarges that description to land then “willed” to him. It would seem to be incumbent on the appellees, therefore, to shew that the land in question then stood in that predicament. This call of the contract would, perhaps, not be satisfied by proving, not that the land was then willed to Rowland Madison, but that it was intended to be willed to him ; but it will be found, on the contrary, that the proofs do not even come up to this mark, in relation to the land in question. The contract not only contemplates a tract then willed to Rowland Madison, by the terms of it, but it also undoubtedly contemplates a specific tract, and not any tract which might thereafter be willed. This idea is kept up in that part which stipulates to make a title to “the land,” first having “both tracts” valued, &c.; thereby evidently shewing that both parlies had their eye upon a particular specific tract, the value of which they were not themselves competent to agree upon, and which, therefore, they left to others. They had in view a particular tract on the part of Rowland Madison, and not any tract of land which might thereafter be willed to him. The cases, therefore, which go to shew that possibilities may be passed under a general description, do not fit this case, in which the description is not general. The question still recurs, was the tract now in question the one contemplated by the parties in the contract?
*It is admitted on all hands, that the tract now in question was not the land of Rowland Madison at the time of the contract. It is also admitted, that it was not then willed to him, as no other will is shewn than one made more than three years after-wards : but the case will be still stronger against the appellees, if it be shewn that this land was not, at the time of the contract, intended to be willed to Rowland Madison, but another tract, the destination of which was afterwards changed; and which (and not this tract) was in the contemplation of the parties, when the contract was entered into, and provision made for the valuation thereof; and this brings us to the proofs in the cause.
It is charged in the bill, that John Madison, the father, had “intended to devise” (not “had devised”) the land in question, to Rowland Madison, as at the date of the contract, and that this intention was known to the family of John Madison, and others. The answer states, as upon belief, that, at the time of the contract, William Madison and Rowland Madison did not expect their father would devise Voss’s to Rowland Madison, but the lower tract, which was after-wards devised to the appellees. This denial in the answer is abundantly supported by-Hugh Crockett, who is admitted to be very respectable, was much confided in by the testator, and perhaps had better opportunities of knowing his sentiments, on this subject, than any other person. He says that the testator, in his life-time, repeatedly informed him, that it was his intention to give Rowland Madison the lower part of the tract of land called Voss’s, and to William Madison the upper part; and that, in consequence of this intention so expressed, Rowland Madison did actually plant fruit trees on the lower part; that afterwards, shortly before the marriage of Rowland Madison with Miss Lewis, and after the death of William Madison, John Madison, the testator, expressed an intention of changing the disposition of the said tract, so as to give to Rowland Madison the upper part, (now in question,) and to give to William Madison’s children the lower part. Nothing can be more con-324 elusive *than this deposition, (in aid of the answer,) to shew, that it was after the date of the contract, and also after William Madison’s death, that the testator altered his intention, which, before, and at the time of, the contract, was to give the the lower tract to Rowland Madison. That tract, therefore, and not the tract now in question, was the one which the parties comtemplated by their contract, and which, in the alleged event, was to be valued. This deposition and answer is not materially impugned by any evidence in this case. Let us investigate, briefly, those parts of the testimony which have been arrayed against it, by one of the appellees’ counsel. It has been supposed that the answer of the appellant, the bond of December, 1789, and the three depositions of Gabriel Madison, George Madison, and Susanna Madison, are ail in opposition to the deposition of Col. Crockett, in this particular.
It was supposed, in the first place, that the answer of the appellant is in collision with Crockett’s deposition. If that counsel was serious in this idea, he has viewed that answer through a very different medium from what I have done. There is nothing in it, in my judgment, which carries the semblance of such an idea. Again, he supposed that the bond of December, 1789, from Rowland *128 Madison to Andrew Lewis, in which he contracts to convey “Voss’s,” willed to him by his father, to the r said Lewis, was also in conflict with that 'deposition. Setting aside the testimony shewing that John Madison’s intention, respecting this land, was intermediately changed, it is difficult to conceive how an admission that a tract of land was willed to a man, on the 5th of December, 1789, amounts to an admission that it was so willed, or intended to be willed, on the 10th of October, 1780. As to the deposition of Gabriel Madison, I can see nothing in it going, by any possibility, to shew that the testator, on the 5th of December, 1789, had willed, or intended .to will, the land called Voss’s to Rowland Madison. The same may be entirely said of that of Susanna Madison. There is, indeed, a general belief expressed by George Madison, that it was 325 ^understood in his father’s family, that he intended to give Voss’s to Rowland Madison : but this belief might have arisen in the mind of the witness at a time posterior to the date of the contract, (which appears from other testimony to have been the case,) and (even throwing this last consideration out of the case) is incompetent to outweigh the testimony of the answer, and that of Hugh Crockett, which is very clear, circumstantial, and express, as to this point, and who is accredited by this witness himself, as to his opportunities of knowing the facts to which he deposes, on account of his acknowledged intimacy with his father.
It is, therefore, neither shewn that the tract of land in question was willed to Rowland Madison at the date of the contract, nor that it was then intended to be willed to him. The proofs on this point are entirely otherwise ; and that it was not until after the date of the contract in question, and after the death of William Madison, that John Madison’s intention was changed so as to intend to will Voss’s to Rowland Madison, which intention he accordingly carried into effect. I will here make one general remark ; and that is, that all those parts of the answer, of the testimony, of the belief of the witnesses, or, even of that of the appellant himself, which seem to consider and admit the contract as applying to the land called Voss’s, prove nothing, as to the fact, whether, at the date of the contract, that tract was the one contemplated by the parties, which, if so proved, would go to supply the deficiency of the contract in this particular. All these may have arisen upon mere report, or under a belief that the contract itself, when produced, or the testimony might go to supply that defect; which, however,, is not the case in the present instance.
My opinion therefore is, that the contract before us does not extend to this land, under any general expressions thereof ; but, on the other hand, extending only to a particular tract willed, or intended to be willed, to Rowland Madison, there is a defect of proof to bring the tract in question under that contract; and that, to say the least, 326 this fair and *bona fide purchaser, for full price, should not be considered as a purchaser with notice; as the doctrines on this subject do not apply to vague and indefinite contracts; but in order to affect a purchaser with notice, there ought to be something to -lead to a knowledge of the specific land contemplated ; a point which, so far from existing in this case in favour of the purchaser, by the means of ordinary diligence on his part, is not even yet established, (as applicable to the land in question,)' after all the care and pains of the appellees, to collect testimony upon the subject.
This case, therefore, being, upon the-merits, extremely clear for the appellant, in every respect, I am of opinion to reverse the-decree, and dismiss the bill; and this without deciding (as being not necessary to be-decided) whether other parties are necessary ; though my present impression is, that they are so.
JUDGE FLEMING.
This being a case of much solicitude and of considerable interest to the contending parties, I have examined the record with great attention ; and though it seemed, at first view, not a little complicated, it appears to me, on a thorough investigation, a very plain case ; and as it has. been fully and ably discussed by the Judges who have preceded me, I shall briefly notice only what appears to me the most material points in the cause.
By the agreement 10th of October, 1780, between William and Rowland Madison, the latter (in lieu of 1,000 acres of land on Boon’s Creek, belonging to William, which Rowland had sold to Gordon, and for which, by a. former agreement, he was to give his land in Botetourt in exchange) was to make William a title to the same quantity of land, obtained by a military warrant, agreeable to his majesty’s proclamation, and clear of any disputes whatsoever ; but in case the said Rowland should not do this, he agrees that the first bargain shall be binding on him ; “that when he comes to the pos327 session of his land willed to *him, that he will make the said William a title for the land; first having both tracts, valued,” &c.
This agreement was, no doubt, understood by, and binding between, the parties, and their respective representatives ; but, even if it had been made public, and recorded in due time, it appears to be too vague and uncertain (no particular land being described therein) to affect any third person, and especially a fair purchaser for a valuable consideration, without the smallest notice of that, or any other agreement, between William and Rowland Madison being in existence.
It appears that the will of John Madison, the father, by which the land in controversy called Voss’s, was devised to Rowland, was. dated the 10th of December, 1783, more than three years after the date of the contract;. and in which land the widow of the testator (who died before the month of March, 1784). had an estate for life. That Rowland Madison was resident in the State of Kentucky at the death of his father, and some years thereafter (probably on the death of his. mother) returned to Virginia and settled on Voss’s, where he resided several years ; and in December, 1789, sold the land to the appellant for 2,0001. to whom he executed a bond in the penalty of 4,0001. to make him a title, on or before the 1st of September, 1790. After the purchase the appellant removed to, and settled on, Voss’s, where he remained *129 quietly until some time in the year 1792, when Mrs. Elizabeth Madison informed him of the contract between William and Rowland Madison as stated in the bill; which the appellant expressly swears in his answer was the first information he ever received concerning that contract; and this is strongly corroborated by the depositions of a number of respectable neighbottrs, in habits of great intimacy with the family, all of whom declare they never heard of such or any other contract between William and Rowland Madison. At the time the notice was given to the appellant, he had been, about two years, in quiet possession of the premises, had paid fifteen sixteenths of the pur328 chase-money; *and the other sixteenth was retained to satisfy an unliquidated debt due, in certificates, from Rowland Madison to one Burford, which he had assumed to pay, and afterwards did pay.
Soon after the sale of the land in question to Eewis, Rowland Madison, in the year 1790, removed to Kentucky (supposed then to have been clear of debt) with 18 or 20 likely negroes, three loaded wagons and teams, and other property.
It appears that Gabriel Madison, a brother of William and Rowland, was present at, and the only witness to, the aforesaid agreement. He was at the time possessed of 3,000 acres of military land lying in Kentucky, such as was therein described; out of which he agreed, in presence of the parries, to furnish Rowland with 1,000 acres, to satisfy the contract, of which 1,000 acres William was to make choice,out of the 3,000 acres aforesaid. He made choice of a tract of 1,000 acres on Simpson’s Creek, and exchanged it with one Craig for a tract in Montgomery County, called Hand’s Meadow ; but, the title of the Simpson’s Creek land being defective, the contract with Craig was cancelled; and William Madison soon after died, in the year 1782. And thus the matter rested until the year 1792 ; two years after A. Lewis, the appellant, had -purchased and got possession of Voss’s, the land in controversy; when Mrs. Madison, mother and guardian of the appellees, (for the first time as before noticed,) informed the appellant of the agreement between William and Rowland Madison; which for eleven years had been a secret except to a few members of the family. It appears, too, from the deposition of Gabriel Madison, that, after the Simpson’s Creek land was lost, he, in order to enable his brother Rowland to fulfil his contract with William, let him have 1,000 acres of land, of the same description, on the river Ohio ; which, if conveyed to William’s heirs, would have completely satisfied the contract; of which land it appears that Rowland was in possession, so late as the year 1795; 329 and, after that period, sold the x'same to Walter Bell, to whom Gabriel Madison, who had the legal title, was afterwards, by a decree of Fayette County Court, compelled to make a conveyance.
It appears also, by the deposition of Gabriel Madison, that several years before.the sale to Walter Bell, he was written to by Colonel Francis Preston, another uncle of the appellees, in their behalf, requesting the deponent to inform him what he knew on the subject.
The deponent wrote Colonel Preston for answer, that he was ready to convey to William Madison’s heirs the 1<000 acres of Ohio land, provided he could get Rowland Madison’s release. And if proper steps had then, or for a year or two thereafter, been taken by the friends of the appellees, who were infants, a conveyance of the Ohio land would have been executed to them; the primary object of the contracting parties fulfilled and an end put to this controversy. And it may be remembered, that the sole motive of changing the original agreement was to give to Rowland Madison the option of substituting 1,000 acres of Kentucky military land for the land he had in expectancy from his father, the identity of which was unknown to the contracting parties, and depended altogether upon a contingency that might never have taken place.
As to the omission of making the representatives of Rowland Madison parties to the suit, the appellant ought not to be affected by it. He has no claim upon them ; and, I conceive, they have none upon him. He appears to be a fair purchaser, for a valuable consideration, without notice of any prior claim to the land in controversy, and ought to be quieted in the possession of his purchase. I am therefore of opinion, that the decree be reversed, and the bill dismissed with costs.
By the whole Court. Decree reversed, and bill dismissed with costs.

 Hobson v. Trevor, 2 P. Wms. 191; Beckley v. Newland, ib. 182; Wright v. Wright, 1 Vez. 409.

 1 Fonb. b. 1, c. 4, s. 2.

 2 Fonb. 2, c. 6, s. 2; Fremoult v. Dedire, 1 P. Wms. 429.

 2 Vern. 600, Wilker v. Bodington.